## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

|  |  |
|---|---|
| SIDNEY COONE LENZ, | |
| Plaintiff, | |
| -vs- | Case No.: _____ |
| | **JURY TRIAL DEMANDED** |
| EXPERIAN INFORMATION SOLUTIONS, INC., AND TRANS UNION, LLC, | |
| Defendants. | |

## COMPLAINT

Plaintiff Sidney Coone Lenz ("Plaintiff" or "Ms. Lenz"), a living, breathing 82-year-old consumer, by and through her undersigned counsel, brings this Complaint against Defendants Experian Information Solution, Inc. ("Defendant Experian" or "Experian") and Trans Union, LLC ("Defendant Trans Union" or "Trans Union") (collectively, "Defendants" or "the Credit Bureau Defendants") for actual, statutory, and punitive damages, costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of the Credit Bureau Defendants' mixing of Plaintiff's credit files and reports with a deceased individual and thereafter inaccurately reporting to Plaintiff's creditors that she is deceased and has no credit score.

## INTRODUCTION

1.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data

technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the credit bureaus acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      The three major national CRAs are Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union").

5.      These CRAs sell credit information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

6.      "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.      Congress made the following findings when it enacted the FCRA in 1970:

    1) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

    2) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

    3) Consumer reporting agencies have assumed a vital role in assembling and evaluation consumer credit and other information on consumers.

    4) There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8.      Thus, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities'". *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C.§1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

10.    One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

11.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.*

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)] (emphasis added).

12.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

13.    "Mixed files" create a false description and representation of a consumer's credit history.

14.    A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

15.     The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is the subject of that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

16.     Mixed files are not a new phenomenon. The Credit Bureau Defendants have been on notice of the existence of mixed files and the fact that their procedures for creating credit files, including their matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

17.     More recently, all three credit bureaus, including the Credit Bureau Defendants, have been the subject of numerous state attorney general actions relating to their mixed file problem.

18.     For example, in 2015, the New York Attorney General filed charges and settled claims with Equifax, Experian, and Trans Union over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

19.     Notwithstanding the Credit Bureau Defendants' notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, dates of birth, and addresses.

20.     Further, mixed files result in the disclosure and publication of consumers' most personal identifying and financial information absent the consumer's knowledge or consent, or

---

[1] https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited April 4, 2023; *see also* https://ag.ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited April 4, 2023.

both.

21.     The Credit Bureau Defendants have been sued thousands of times wherein an allegation was made that they violated the FCRA. Moreover, the Credit Bureau Defendants are sued, at a minimum, hundreds of times each year wherein an allegation is made that they have mixed a consumers' credit file with that of another person.

22.     Private FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

23.     For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case No. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000 in actual damages and $5 million in punitive damages. Despite the verdict, the Credit Bureau Defendants continue to mix consumers' credit files with other consumers' credit files.

24.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000 in actual damages and $2.7 million in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms.  Williams' disputes. Despite the verdict, the Credit Bureau Defendants continue to mix consumers' credit files with other consumers' credit files.

25.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000 in actual damages and $18.4 million in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Millers' numerous disputes. Despite the

verdict, the Credit Bureau Defendants continue to mix consumers' credit files with other consumers' credit files.

26.     Most recently, a jury assessed a $60 million verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC,* No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion LLC*, 951 F.3d 1008 (9th Cir. 2020) Despite the verdict, the Credit Bureau Defendants continue to mix consumers' credit files with other consumers' credit files.

27.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

28.     No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

29.     Finally, the Federal Trade Commission has specifically warned consumer reporting agencies, including the Credit Bureau Defendants, to review their procedures when a mixed file case occurs.

30.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

31.     Plaintiff's claims arise out of the Credit Bureau Defendants blatantly inaccurate credit reporting, wherein they mixed Plaintiff's credit file with personal and credit information belonging to an unrelated, deceased, individual and, consequently, falsely reported to Plaintiff's potential creditors that she is "deceased" and does not have a credit score.

32.     Accordingly, Plaintiff brings claims against the Credit Bureau Defendants regarding their failure to follow reasonable procedures to assure the maximum possible accuracy of the contents of Plaintiff's credit files and reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

33.     Additionally, Plaintiff brings a claim against Defendant Experian for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed—mainly, that she is not deceased and has a credit score—was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiff's credit file and report(s), in violation of the FCRA, 15 U.S.C. § 1681i(a)(1)(A).

34.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Experian and Trans Union for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.*, as described herein.

**THE PARTIES**

35.    Plaintiff Sidney Coone Lenz ("Plaintiff" or "Ms. Lenz") is a natural person who resides in the City of Plano, State of Texas, and is a consumer as that term is defined in 15 U.S.C. § 1681a(c).

36.    Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation with a principal place of business located at 701 Experian Pkwy, Allen, Texas 75013, and is authorized to do business in the State of Texas, including within this District.

37.    Defendant Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Defendant Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

38.    Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 2 Baldwin Place, Chester, PA 19022, and is authorized to do business in the State of Texas, including within this District.

39.    Defendant Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Defendant Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

40.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allow claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

41.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

42.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

43.    The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personal, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information…." 15 U.S.C. § 1681(b).

44.    The FCRA further requires that when preparing consumer reports, a consumer reporting agency must follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

### The Credit Bureau Defendants' Processing of Credit Information

45.    The Credit Bureau Defendants regularly receive information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

46.    These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

47.    The Credit Bureau Defendants collect information from thousands of furnishers.

48.     The process by which the Credit Bureau Defendants receive, sort, and store information is largely electronic.

49.     Furnishers report credit information to the Credit Bureaus Defendants through the use of coded tapes that are transmitted to the Credit Bureau Defendants on a monthly basis through software known as Metro 2.

50.     The Credit Bureau Defendants take the credit information reported by furnishers and create consumer credit files.

51.     The Credit Bureau Defendants maintain credit files on more than 200 million consumers.

52.     Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

### The Credit Bureau Defendants' Mixed File Problem

53.     The Credit Bureau Defendants know that different consumers can have similar names.

54.     The Credit Bureau Defendants know that different consumers can have similar Social Security numbers.

55.     The Credit Bureau Defendants know that different consumers with similar names can also have similar Social Security numbers.

56.     The Credit Bureau Defendants know that public records often do not contain identifying information such as Social Security numbers or dates of birth.

57.     The Credit Bureau Defendants match tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or

public record to the information they maintain about the consumer in the consumer's credit file or files.

58.    The Credit Bureau Defendants accomplish this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

59.    Sometimes the Credit Bureau Defendants' matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what is commonly known in the industry as a mixed or merged credit file.

60.    Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Experian and Trans Union, regarding their significant failures and deficiencies with respect to mixed files.

61.    Despite the Credit Bureau Defendants long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by the Credit Bureau Defendants containing information belonging to another consumer.

62.    A mixed or merged credit file is the result of the Credit Bureau Defendants inaccurately mixing personal identification information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

63.    There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms (the database rules) used by the Credit Bureau Defendants to match personal identifying information and credit information, including public record information, to a particular consumer's credit file.

64.     The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to the Credit Bureau Defendants.

65.     A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to the Credit Bureau Defendants.

66.     These rules also determine which credit files are selected by the algorithm and merged to create a complete consumer report.

67.     Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

**The Credit Bureau Defendants' Flawed Matching Procedures**

68.     The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores. One item of information that the Credit Bureau Defendants include on reports they sell is information about whether the consumer who is the subject of the report is deceased.

69.     One way the Credit Bureau Defendants determine whether a given consumer is deceased is by cross-referencing the consumer's Social Security number with information maintained by the Social Security Administration ("SSA") in a document called the "Death Master File," which contains information about deceased persons whose deaths were reported to the SSA, including whether the deceased persons Social Security number was used at any point in time for filing a death benefits claim.

70.     However, the Credit Bureau Defendants do not have reasonable procedures to assure that there is only one Social Security number associated with each consumer and, in fact, associate multiple Social Security numbers with consumers' credit files.

71.     Accordingly, the Credit Bureau Defendants routinely mix deceased consumers' Social Security numbers into the credit files and reports of living consumers, which results in the Credit Bureau Defendants reporting to the living consumer's potential creditors that he or she is deceased and, consequently, has no credit score.

72.     The Credit Bureau Defendants do not employ any procedures *at all* to assure that a consumer it is reporting as "deceased" based on a purported Social Security number match to the SSA's Death Master File is, in fact, actually deceased before publishing a credit report regarding that consumer to a creditor indicating the same, for profit.

73.     Even in instances where other data on the face of the consumer's report indicates that he or she is not deceased, the Credit Bureau Defendants do not employ any procedures to assure that a consumer they report as "deceased" based on the SSA's Death Master File is, in fact, actually deceased before reporting the same to that consumer's potential creditors.

74.     Once the Credit Bureau Defendants label a consumer as deceased, they will not calculate and will not provide a credit score for that consumer.

75.     As a general rule, creditors will not lend to consumers for whom any the major CRAs will not provide a credit score, particularly when the creditor is informed the basis for the Credit Bureau Defendants' refusal to issue a score is that the consumer credit applicant is deceased.

76.     The Credit Bureau Defendants' false deceased reporting therefore locks consumers out of the credit market entirely.

77.     The Credit Bureau Defendants charge third parties a fee for reports stating that a consumer is deceased.

78.     The Credit Bureau Defendants profit from the sale of reports regarding purportedly deceased consumers.

79.     The Credit Bureau Defendants know that deceased consumers do not apply for credit.

80.     The Credit Bureau Defendants know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identification information of deceased consumers is known to the Credit Bureau Defendants to be a common and major source of identity theft.

81.     The Credit Bureau Defendants know that identity theft and credit fraud are serious and widespread problems in our society.

82.     The Credit Bureau Defendants warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing a deceased consumer's credit information or report.

83.     Yet, the Credit Bureau Defendants do not require an executorship paper, or any other documentation demonstrating a legitimate purpose for accessing the report of a deceased consumer when such access is requested by a paying customer. The Credit Bureau Defendants impose no additional requirements whatsoever on paying customers who request a purportedly deceased consumer's credit information.

84.     Instead, the Credit Bureau Defendants sell reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general

15

certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

85.    For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for the Credit Bureau Defendants to sell their credit reports to a paying customer, absent a court order.

**Plaintiff's Application for an Ollo Rewards Credit Card is Denied in March 2022**

86.    In or about early March 2022, Plaintiff received an offer to apply for an Ollo Rewards Credit Card (the "Ollo Credit Card"), which was being promoted by Experian as a way to increase her credit score.

87.    Plaintiff was interested in continuing to build her credit and maintain a strong credit score in anticipation of larger purchases she was contemplating.

88.    On or about March 8, 2022, Plaintiff submitted an online application for the Ollo Credit Card and authorized The Bank of Missouri, the issuer of the Ollo Credit Card at that time, to obtain her credit report(s).

89.    On or about March 8, 2022, in order to determine whether Plaintiff qualified for the credit card she sought, The Bank of Missouri purchased a copy of Plaintiff's credit report from each of the Credit Bureau Defendants.

90.    Plaintiff's credit application for an Ollo Credit Card was subsequently denied.

91.    On or about March 8, 2022, Plaintiff received written correspondence confirming the same, in the form of an Adverse Action Notice. The Adverse Action Notice for the Ollo Credit Card stated the reason for the denial was as follows: "We have obtained records that indicate the applicant has been reported as deceased."

92.     The Credit Bureau Defendants were both listed as sources of information on which The Bank of Missouri made its credit decision.

93.     The Credit Bureau Defendants reporting regarding Plaintiff was grossly inaccurate: Plaintiff is not deceased and has a credit score.

94.     Due to the Credit Bureau Defendants' inaccurate reporting, Plaintiff was denied the credit she sought and was otherwise qualified for.

95.     By reporting Plaintiff as deceased and without a credit score to The Bank of Missouri, the Credit Bureau Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the contents of the credit reports they published and maintain concerning Plaintiff.

**Plaintiff Discovers the Credit Bureau Defendants' Inaccurate Deceased Reporting in March 2022**

96.     Shortly thereafter, shocked, concerned, and anxious about being reported as deceased, stressed about how it may negatively impact her future credit and financial transactions, and worried that it may cause issues with her receiving Social Security benefits and other retirement income, Plaintiff requested a copy of her credit reports from each of the Credit Bureau Defendants.

97.     On or about March 16, 2022, Plaintiff received a copy of her Experian credit report. Upon review of her Experian credit report, Plaintiff discovered numerous inaccuracies, which indicated that her credit report/file had been mixed with that of another person.

98.     For example, Plaintiff discovered that Experian was reporting multiple addresses at which Plaintiff has never resided, including the following:

> 4940 S Wendler Dr, Ste 101, Tempe, Arizona 85282-6312
> 6621 Seth Barwise St, Fort Worth, Texas 76179-3311

99. On or about March 16, 2022, Plaintiff also received a copy of her Trans Union credit report. Upon review of her Trans Union credit report, Plaintiff discovered numerous inaccuracies, which indicated that her credit report/file had been mixed with that of another person.

100. For example, Plaintiff discovered that Trans Union was reporting multiple addresses at which Plaintiff has never resided, including the following:

> 4940 S Wendler Dr, Ste 101, Tempe, Arizona 85282-6312
> 6400 Legacy Dr, Plano, TX 75024-3609

101. Trans Union was also reporting the following telephone number, which Plaintiff has never used or been associated with:

> (972) 359-8539

102. By reporting the above-referenced inaccurate information in Plaintiff's credit reports, despite the fact that the information does not belong to Plaintiff, the Credit Bureau Defendants failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit file and credit reports, in violation of 15 U.S.C. § 1681e(b).

**Plaintiff's First Dispute with the Credit Bureau Defendants in March 2022**

103. On or about March 25, 2022, Plaintiff sent a dispute letter to each of the Credit Bureau Defendants, disputing the inaccurate personal information each was reporting about her to potential creditors, respectively, as well as the fact that they had reported her as deceased and without a credit score.

104. As part of her disputes, Plaintiff provided sufficient personal identification information to identify herself, including her full name, date of birth, Social Security number,

and current address; as well as photocopies of her current Texas driver's license, the Ollo Card Adverse Action Notice, and her inaccurate credit reports.

105.    She requested that the Credit Bureau Defendants reinvestigate the disputed information, correct the deceased reporting, and send her corrected copies of her credit reports.

**The Credit Bureau Defendants' Method for Considering Consumer Credit Report Disputes**

106.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

107.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industry's standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

108.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II." It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

109.    Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

110.    Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

111. The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

112. These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

113. Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

114. Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via eOSCAR.

**The Credit Bureau Defendants' Responses to Plaintiff's March 2022 Dispute**

115. On or about April 1, 2022, Plaintiff received dispute results from Trans Union confirming that the disputed addresses and phone number had been removed from her credit file.

116. Trans Union's response failed to address Plaintiff's dispute of the deceased notation in her credit file, which Trans Union reported to The Bank of Missouri in connection with Plaintiff's application for an Ollo Card.

117. On or about April 4, 2022, Experian electronically transmitted dispute results to Plaintiff.

118. Experian failed to remove the disputed addresses from Plaintiff's credit file and did not respond to her dispute of the deceased notation, which Experian reported to The Bank of Missouri in connection with Plaintiff's application for an Ollo Card.

119.    Furthermore, Experian's dispute response revealed additional inaccurate information on Plaintiff's Experian credit report that did not appear in the previous report she had received from Experian.

120.    Specifically, Experian's dispute results indicated her Experian credit report now reported the following PO Box Plaintiff had never used or been associated with:

PO Box 57018, Oklahoma City, OK 73157

121.    Experian's dispute results also indicated her Experian credit report now included three additional Social Security number variations that do not belong to Plaintiff and which Plaintiff has never been associated with:

XXX-XX-9763
XXX-XX-0763
XXX-XX-3763

122.    Experian's dispute results also indicated her Experian credit report now included the following credit card account that does not belong to her and which she has never been associated with:

Account name: DISCOVER BANK
Account number: 601100284315….
Type: Credit card
Date opened: December 2008

123.    By failing to delete the inaccurate personal identification information, the deceased notation, and by including additional information in Plaintiff's credit file that does not belong to her, Experian failed to conduct a reasonable reinvestigation of the information disputed by Plaintiff, or any reinvestigation at all, to determine whether the disputed information was inaccurate and record the current status of the disputed information, and correct the inaccurate, disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

124.    Thereafter, Experian failed to correct or delete the deceased notation appearing in Plaintiff's credit report and continued to report her as deceased and without a credit score.

### Plaintiff's Second Dispute with Experian in April 2022

125.    On or about April 14, 2022, extremely shocked, surprised, and anxious at Experian's failure to reinvestigate her previous dispute, combined with the additional inaccurate personal and credit information now included in her Experian credit report, Plaintiff sent a second dispute letter to Experian disputing the inaccurate deceased notation in her credit file, as well as the personal and credit account information Experian was reporting that does not belong to her.

126.    As part of her dispute, Plaintiff provided sufficient personal identification information to identify herself, including her full name, date of birth, Social Security number, and current address, as well as photocopies of her current Texas driver's license, the Ollo Card Adverse Action Notice, her inaccurate Experian credit report, and Experian's response to her March dispute.

127.    She requested that Experian reinvestigate and remove the disputed information, correct the deceased reporting, and send her a corrected copy of her credit report.

### Defendant Experian's Response to Plaintiff's April 2022 Dispute

128.    On May 9, 2022, Plaintiff received dispute results from Experian confirming that the inaccurate Social Security number variations, Discover Bank tradeline, and all but one of the addresses not belonging to her had been removed from her credit file.

129.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered actual damages including, without limitation, being denied a credit card; loss of credit; loss of the ability to purchase and benefit from her good name and credit rating; detriment

to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including, but not limited to, loss of sleep; stress; anxiety; and the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and being reported as deceased and without a credit score.

130.    At all times pertinent hereto, the Credit Bureau Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Credit Bureau Defendants herein.

131.    At all times pertinent hereto, the conduct of the Credit Bureau Defendants, as well as that of their agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Plaintiff herein.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures
### (First Claim for Relief Against Defendants Experian and Trans Union)

132.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-131, as if fully stated herein.

133.    The Credit Bureau Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation and contents of the credit reports and credit files they published and maintain concerning Plaintiff.

134.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered actual damages including being denied credit; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating; the expenditure

of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including, but not limited to, loss of sleep; stress; anxiety; and the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and being reported as deceased and without a credit score.

135.    The Credit Bureau Defendants' conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

136.    Plaintiff is entitled to recover attorney's fees and costs from the Credit Bureau Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### 15 U.S.C. § 1681i(a)(1)
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against Defendant Experian)

137.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-131, as if fully stated herein.

138.    Defendant Experian violated 15 U.S.C. § 1681i(a)(1) by failing to delete inaccurate information in Plaintiff's credit file and credit report(s) after it received notice of such inaccuracies; by failing to conduct a lawful reinvestigation of disputed personal identification information, credit accounts, and a deceased notation in Plaintiffs' credit file and credit report(s); and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file(s) and credit report(s).

139.    As a result of Defendant Experian's conduct, action, and inaction, Plaintiff suffered actual damages including, without limitation, being denied a credit card; loss of credit;

loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including, but not limited to, loss of sleep; stress; anxiety; and the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and being reported as deceased and without a credit score.

140.    Defendant Experian's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiffs to recover under 15 U.S.C. § 1681o.

141.    Plaintiff is entitled to recover attorney's fees and costs from Defendant Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a)    Determining that the Credit Bureau Defendants negligently and/or willfully violated the FCRA;

b)    Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c)    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and

d)    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

142.    Plaintiff demands a trial by jury.

Respectfully submitted,

**SIDNEY COONE LENZ**

Dated: January 31, 2024

By: */s/ Hans W. Lodge*
Hans W. Lodge, MN Bar No. 0397012
Bryan L. Plaster, MN Bar No. 0402792*
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. (612) 607-7794
F. (612) 584-4470
hlodge@bm.net
bplaster@bm.net
*Pro Hac Vice Forthcoming*

*Attorneys for Plaintiff*